Bertram FIELD and Edward F. Fanucchi, Plaintiffs,

v.

Henry G. ALLYN, Jr., Gordon E. Neuenschwander, G. Gray Garland, Jr., Bernard B. Smyth, the Pittsburgh and Lake Erie Company and Beloit Corporation, Defendants.

Court of Chancery of Delaware, New Castle County.

Submitted Aug. 27, 1982.

Decided Jan. 27, 1983.

Irving Morris, of Morris & Rosenthal, Wilmington, and William Klein, II, of Tenzer, Greenblatt, Fallon & Kaplan, New York City, for plaintiffs.

David A. Drexler, and Thomas C. Grimm, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants.

BROWN, Chancellor.

This is a decision after trial in a class action brought on behalf of the former minority shareholders of the Pittsburgh and Lake Erie Railroad Company, a Delaware corporation. The suit attacks both a tender offer and a subsequent cash-out merger whereby a newly-formed company, after purchasing a 92.6 per cent interest in the corporation from the previous owner of that interest, acquired, and thus eliminated, the remaining 7.4 per cent public minority interest. While the facts of the matter are predictably complex and involved, the end result which has given rise to the plaintiffs' complaint is relatively simple to understand.

In fact, through it all, it appears that it is the status of things resulting from the tender offer and the merger, and the means by which that status was achieved, that the plaintiffs find to be troublesome as opposed to the usual contentions concerning the fairness of the merger price or the representations made during the tender offer. From the manner in which the plaintiffs' theories of liability seem to have vacillated from one thing to another throughout the course of the litigation, it seems readily apparent that the plaintiffs have had great difficulty in placing their finger on precisely what it is that is wrong. They are earnestly convinced, however, that on the facts of the matter something has got to be wrong, and having caused the facts to now be spread before the Court for the "judicial scrutiny" so often referred to in our case decisions, they demand relief.

It is perhaps for this very reason that I have difficulty in finding any actionable

wrongdoing on the part of the defendants. This, when coupled with the absence of any direct precedent cited by the plaintiffs under the law of Delaware or elsewhere, causes me to conclude that judgment must be entered in favor of the defendants.

What the plaintiffs complain about is the fact that the four individual defendants, two of whom were key officers of the Pittsburgh and Lake Erie Railroad Company at the time, were able to put together a highly-leveraged plan whereby, with the financial assistance of the defendant Beloit Corporation and with virtually no cash outlay of their own, they, along with Beloit Corporation, were able to acquire complete ownership of the Pittsburgh and Lake Erie Railroad Company by means of using the assets of the corporation to finance the cost of its acquisition. To understand the situation the following facts will suffice.

The Pittsburgh and Lake Erie Railroad Company (hereafter referred to as "the P & LE") is a Class I railroad operating a system of more than 377 miles of main line track serving the industrial complexes of the greater Pittsburgh, Pennsylvania and Youngstown, Ohio areas. The company was formed in 1875. As of March 1979, shortly before the tender offer and merger complained of, the assets of the P & LE included 10,744 freight cars and 56 locomotives. These particular assets, referred to hereafter as the rolling stock, had an unencumbered, appraised value of between $118 million and $124 million at the time. Since its rolling stock far exceeded its own needs, it was the practice of the P & LE over the years to lease these cars to other railroads on a per diem basis for use around the country. The leasing of its cars on this basis produced substantial revenue.

In 1979 the total book value of all of the P & LE's assets was some $168 million. In an era in which railroads had declined generally, the P & LE had been able to survive. It had a history of good management and profitability and was basically well maintained. It had a good record of earnings and stability from a financial standpoint.

In recent years this was necessarily attributable in part to the efforts of the defendant, Henry G. Allyn, Jr., its President and Chief Executive Officer, and the defendant, Gordon E. Neuenschwander, its Vice President and General Counsel. Both Allyn and Neuenschwander were also directors.

Prior to 1968 the P & LE had been owned 80 per cent by the New York Central Railroad and 20 per cent by public shareholders. In 1968, by virtue of the merger which created the Penn Central Transportation Corporation ("Penn Central"), the P & LE became a part of the Penn Central system, although it was still operated as a separate company with its own management and board of directors.

In July, 1968, through a tender offer package of cash and securities having an announced value of $165 per share, Penn Central attempted to gain 100 per cent ownership of the P & LE. This tender offer was successful to the extent that Penn Central thereby increased its ownership interest to 92.6 per cent. Thereafter, as is generally known, Penn Central fell upon hard times and in 1970 filed for reorganization under the bankruptcy laws. Trustees were appointed to supervise its operations.

Still later, the governmentally funded Conrail operation came into existence to assume ownership of most of Penn Central's railroad assets. Largely through the efforts of Allyn and Neuenschwander, however, the P & LE was excluded from the Conrail umbrella and continued to remain a viable, independent railroad company.

In 1973 the defendant Bernard B. Smyth, a Pittsburgh lawyer and business consultant, was approached by others with regard to putting together a group of investors for the purpose of attempting to purchase the P & LE from the Penn Central Trustees. At that time the Trustees indicated that Penn Central's P & LE stock interest was not for sale.

By 1976, however, the Trustees were forced to change their position and at this

point they began actively to seek a buyer for the Penn Central interest. Smyth reappeared on the scene, this time on behalf of U.S. Filter Corporation. However, based upon a negative report from its financial advisers, U.S. Filter eventually abandoned its interest. Through early 1978, apparently only one offer was made to the Trustees for the P & LE shares, that being an offer by Crane Corporation at $75 per share. This was rejected by the Trustees as being inadequate.

Smyth, however, continued to maintain his interest and in 1977 he approached Allyn and Neuenschwander, asking if they would be interested in becoming part of a group to purchase the railroad in the event that he could put such a group together. Allyn had neither great personal wealth nor financial experience or expertise. He was a railroad man. He doubted that Smyth could come up with the money needed to accomplish such a vast project. Nonetheless, he and Neuenschwander indicated their willingness to participate.

Smyth then got in touch with the defendant G. Gray Garland, a senior partner in a Pittsburgh law firm and a business entrepreneur in his own right. Garland had past commercial experience in both railroads and in the leasing business. After studying the situation, Garland became convinced that the acquisition of the P & LE could be accomplished on a more highly leveraged basis than Smyth had envisioned. He recognized that the large number of railroad cars owned and being leased to other railroads by the P & LE constituted desirable cash-generating assets which could be looked upon with favor by prospective lenders. Garland concluded that a purchase of the P & LE by borrowing against its rolling stock was possible with much less equity than Smyth had supposed.

Both Garland and Smyth also recognized that it was absolutely necessary to include Allyn and Neuenschwander as part of any such acquisition plan. Since such a leveraged purchase as Garland had in mind would be dependent upon the cash flow and income derived from the operation of the railroad, it was vital to keep the successful incumbent management in place if their acquisition plan was to have any chance of success.

Accordingly, Garland, Smyth, Allyn and Neuenschwander thereafter merged their respective interests in a common desire to acquire, if possible, the P & LE, the majority interest which, by then, was openly being touted for sale by the Penn Central Trustees. These four defendants are referred to collectively hereafter as the "Pittsburgh Group." In due course, they also formed a corporation, The Pittsburgh and Lake Erie Company (hereafter referred to as "PLECO"), for the purpose of carrying out this enterprise. For the initial price of $1 per share, 255 shares each in PLECO were issued to Garland and Allyn and 160 shares each were issued to Smyth and Neuenschwander.

In early 1978, with Smyth and Garland handling the negotiations, and with Garland spearheading the efforts to obtain financing, the Pittsburgh Group was able to negotiate a tentative agreement to purchase Penn Central's P & LE stock at a price of $84.50 per share. The Mellon Bank of Pittsburgh indicated a willingness to provide the needed financial assistance. However, this tentative agreement—known as the "handshake" deal by the parties—was never formalized. This was because the Penn Central Trustees refused to sell based upon the acquisition plan contemplated by the Pittsburgh Group.

The Pittsburgh Group had recognized from the outset that 100 per cent ownership of the P & LE stock was needed by it in order to obtain the financing necessary to accomplish the purchase of Penn Central's 92.6 per cent interest. At the time that they had entered into the handshake deal Garland and Smyth believed that this 100 per cent ownership could be achieved by causing PLECO, the corporation formed by the Pittsburgh Group, to bring about a merger of the P & LE into PLECO, or a subsidiary of PLECO, pursuant to 8 *Del.C.*

§ 253.* It was contemplated that such a merger would take place simultaneously with the closing by PLECO of its purchase of Penn Central's P & LE stock, with the assets of the newly merged corporation being immediately pledged to secure the borrowing necessary to amass the whole of the purchase price needed by PLECO to acquire both the Penn Central and the minority interests. This proposed format was known as the "simultaneous transaction."

The Penn Central Trustee, however, would not consent to such a simultaneous transaction. Rather, the Trustees insisted that the sale of Penn Central's P & LE stock had to be a "clean deal," i.e., one that would insulate them, to the extent possible, from any claim that the Trustees, acting on behalf of the P & LE's majority shareholder, had dealt unfairly with, or breached any duty owed to the public minority shareholders of the P & LE. Accordingly, as was soon learned by the Pittsburgh Group, the Trustees insisted on two things. First, they insisted that the sale by them of Penn Central's P & LE interest had to be structured as a cash transaction between them and the purchaser. Secondly, they insisted that any cash purchaser make an immediate tender offer to the minority at a price per share no less than that paid to Penn Central.

This position taken by the Trustees eliminated the proposed simultaneous transaction plan of the Pittsburgh Group and threatened to terminate their hopes to acquire the P & LE. Without financing, they had no funds with which to purchase the interest of Penn Central. Unless they could use the assets of the P & LE as security for the financing, they could not obtain a loan of the needed funds. But until they could acquire 100 per cent of the P & LE stock, they would not be in a position to utilize the assets of the P & LE as security for the needed financing. In the meantime, the Trustees would only sell the Penn Central interest for cash, provided that such a sale

was also followed by a tender offer to the minority for cash. As a result of this it became evident to Garland and Smyth that their only hope lay in obtaining a "bridge loan," i.e., an essentially unsecured loan of the funds needed to purchase the Penn Central interest, such loan to remain in place until the minority interest could be acquired and the 100 per cent interest then utilized to provide security for permanent financing which, in turn, would serve to pay off the bridge loan.

The Pittsburgh Group soon found that such a bridge loan on the highly leveraged basis contemplated by them was impossible to obtain. The Mellon Bank withdrew from participation and the handshake deal was aborted. To make matters worse for the Pittsburgh Group, other potential purchasers for the Penn Central's P & LE stock began to appear on the scene. Garland continued to pursue the matter, however, and in November 1978, through certain business brokers, he was introduced to The First National Bank of Boston (hereafter "FNBB"). As a result of this meeting, the machinery by which the Pittsburgh Group, through PLECO, acquired the P & LE was put in place.

After investigation, FNBB concluded that a loan secured by the rolling stock of the P & LE was potentially sound. At the same time FNBB recognized that the bridge loan sought by the Pittsburgh Group represented a very high risk. This can be illustrated as follows.

It was contemplated that a sum in the vicinity of $50–$60 million would be needed to purchase the 92.6 per cent interest of Penn Central. An additional sum would be needed to acquire the remaining minority interest. In order to assure the ability to acquire the minority interest, the Penn Central interest had to be purchased first.

If FNBB advanced the funds to the Pittsburgh Group to purchase the Penn Central interest, the only immediate security that

---

* This statute permits one owning 90 per cent or more of the outstanding stock of a Delaware corporation to cause it to merge with another corporation by means of a resolution of the board of directors without the necessity of a vote of the shareholders.

the Pittsburgh Group could provide for that loan would be a pledge back of the 92.6 stock interest in the P & LE that would be acquired from the Penn Central Trustees. As security for the bridge loan, however, the P & LE stock would be of limited value.

In the first place, the only cash flow derived from such a 92.6 per cent stock interest would be the dividends, and this would not be sufficient to cover the debt service on a $50–$60 million loan. Secondly, in the event of a default, it is said that such a control block of railroad stock would become virtually unmarketable. This is because a railroad company, with tracks and facilities in place and forming a connecting part of an overall railway system, cannot be liquidated at will. Such a railroad company is subject to the control of the Interstate Commerce Commission and, under the regulations of that agency, the pledge of a control block of railroad stock is, in effect, relegated to a locked-in position junior to all direct creditors of the railroad itself. Since shareholder liquidation is thus problematical at best and subject to the control of another source, the stock of such a railroad company has little prospective value for liquidation purposes. Consequently, it has practically no value for security purposes when it comes to borrowing large sums of money. At least this is the status of the evidence in this case.

Accordingly, while FNBB agreed to the idea of the bridge loan, it did so on two primary conditions. First, it demanded that the Pittsburgh Group provide at least $11,250,000 in equity and, second, it insisted on the right to approve the plan of acquisition of the P & LE minority interest, including the right to require that the P & LE minority receive stock in PLECO rather than cash if FNBB deemed the situation to warrant it. This latter requirement by FNBB was made in an effort to assure the speediest possible acquisition of the minority interest by PLECO so as not to leave the short-term and relatively unsecured bridge loan hanging during the course of protracted shareholder litigation, etc.

Garland and Smyth then set about to produce the additional equity demanded by FNBB. After negotiations, the defendant Beloit Corporation, a former client of Smyth, agreed to participate in the proposed transaction in return for a 51 per cent interest in PLECO (but with the understanding that the Pittsburgh Group would retain control of the board of directors of PLECO). For this interest, Beloit loaned PLECO $800,000 and agreed to purchase $11,200,000 in PLECO preferred stock upon the closing of a deal with Penn Central for the acquisition of Penn Central's P & LE stock. Beloit also agreed to advance up to $4,000,000 in additional loans to PLECO if such were needed to achieve 100 per cent ownership of the P & LE. With the stabilizing advent of Beloit Corporation into the picture FNBB was able to arrange a syndication of the bridge loan among several other banks and, with its financing commitments thus in place, PLECO and the Pittsburgh Group were ready to turn again to Penn Central.

By this time, as noted previously, several other potential purchasers for the Penn Central interest had entered the picture. As a result of this, it was determined on behalf of Penn Central to solicit bids for its 92.6 per cent stock interest in the P & LE. A form of agreement was adopted which met Penn Central's requirements for the sale and a date certain was fixed for the receipt of bids. Two conditions imposed upon all bidders by Penn Central were (1) that no simultaneous transaction with the P & LE minority could be effected and (2) that a tender offer at no less than the price paid to Penn Central be made to the P & LE minority within 60 days of the closing of the purchase of the Penn Central interest.

This spectre of competitive bidding caused a problem for PLECO. There was concern that the $84.50 per share proposal under the handshake deal might be known to others. Accordingly, although realizing the risk involved, PLECO ultimately concluded to submit a formula bid. Under this

proposal it offered either $86.00 per share or $1.25 per share above the highest competing bid received by Penn Central, whichever was the greater. Although five bids were anticipated by Penn Central, only three were submitted. Under its formula proposal, the PLECO bid was accepted at $90.25 per share, the next higher bid having been $89.00 per share. A challenge to this bidding procedure by the $89.00 per share bidder brought no action from the Securities and Exchange Commission. A contract for the purchase of Penn Central's P & LE interest was signed on February 26, 1979.

PLECO then resumed negotiations with FNBB concerning the plan to acquire the remaining minority interests. Thereafter, the purchase by PLECO of Penn Central's P & LE stock was closed on May 15, 1979. For this purpose FNBB made the "bridge loan" to PLECO in the sum of $60 million which PLECO used to cover the purchase price. PLECO pledged back the 92.6 per cent stock interest in the P & LE as security for the loan. Under the terms of the purchase PLECO then had 60 days in which to make a tender offer to the P & LE minority at no less than $90.25 per share. At the suggestion of Beloit, PLECO retained the investment banking firm of Lehman Brothers to advise it with respect to the tender offer and to recommend a fair price to be offered to the minority.

After an analysis of the situation, Lehman Brothers recommended that the offering price also be $90.25. While this perhaps represented a low premium over the public market price of $85.00 that immediately preceded the announcement of the PLECO-Penn Central agreement, Lehman Brothers concluded from its analysis of various other factors that such a price was a fair one. Of particular significance was the fact that Penn Central had received only $90.25 per share after arms-length bidding, which price included a presumed control premium.

Despite this recommendation, however, PLECO's board felt that something more should be offered. Over the initial resistance of some board members it was concluded to offer a figure equivalent to the highest "asked" price for P & LE stock over the prior five-year period of 1974–1979. At the time it was believed that the price had been $110 per share. On the eve of the tender offer, however, PLECO discovered that the highest "asked" price during that period had been $115 per share. Accordingly, the tender offer was made at $115 per share, or at a price $24.75 per share higher than the price paid by PLECO to obtain a 92.6 per cent stock interest in the P & LE as a result of arms-length, competitive bidding with others. The tender offer was successful. Of the 52,366 outstanding minority shares, fully two-thirds, or 34,804, were voluntarily tendered and paid for at $115 per share.

In view of the response to the tender offer FNBB was satisfied that it would not be necessary to require PLECO to offer the P & LE's remaining minority shareholders an equity position in PLECO. The success of the tender offer convinced FNBB that a cash-out merger of the remaining minority shares was an acceptable risk. Thus, FNBB waived its right to approve the format of the merger and permitted PLECO to effect a merger for cash. Accordingly, on August 30, 1979 PLECO, being a more than 90 per cent shareholder of the P & LE, brought about a short-form merger pursuant to 8 *Del.C.* § 253 whereby the P & LE was merged with a wholly-owned subsidiary of PLECO, with the P & LE being the survivor and with the remaining minority shareholders of the P & LE being merged out for the same price of $115 per share as was paid during the tender offer.

With PLECO now owning 100 per cent of the P & LE, the final pegs of the acquisition plan were put in place. Specifically, the P & LE, as now fully controlled by PLECO, entered into a sale of its rolling stock to FNBB for the sum of $60 million. FNBB, in turn, leased this rolling stock back to the P & LE over a period of ten years, at an annual rental of $6 million per year, with interest. Under the terms of the lease-back, the rolling stock is to again be-

come the property of the P & LE at the end of the ten-year lease period, assuming of course that all obligations of the P & LE under the lease are fulfilled.

Upon receipt of the $60 million sale price from FNBB, the P & LE declared a dividend to PLECO in the sum of $60 million. PLECO then paid the $60 million to FNBB so as to pay off the bridge loan. This, in turn, freed the 92.6 per cent stock interest acquired by PLECO from Penn Central from its pledge to FNBB as security for the bridge loan. As a result, PLECO ended up with an unencumbered 100 per cent ownership of the P & LE. The four individual defendants, along with the defendant Beloit, own all of the outstanding stock in PLECO. The respective interests of these defendants in the authorized voting stock structure of PLECO is as follows:

| | | |
|---|---|---|
| Beloit Corporation | 1,020 shares | 51% |
| Allyn | 255 shares | 13.4% |
| Neuenschwander | 160 shares | 8.4% |
| Garland | 255 shares | 13.4% |
| Smyth | 160 shares | 8.4% |

(The remaining 5 per cent, or 100 shares, was issued originally to two business brokers as a finder's fee for putting Garland in touch with FNBB. These shares were subsequently repurchased by PLECO for the sum of $1,150,000 and retained as treasury shares.)

As can be seen from the foregoing, the effect of the financial machinations successfully employed by the Pittsburgh Group was to use the credit of the P & LE's rolling stock as the means to obtain the funds needed to acquire a 100 per cent ownership interest in the P & LE, the only sacrifice along the way being their surrender of a 51 per cent interest in their enterprise to Beloit so as to provide the equity participation required in order to obtain the bridge loan. The bridge loan, obviously, was the key to the success of the entire plan. But at the same time the ability to use the credit of the assets of the corporation to finance their acquisition of the stock of the corporation was the foundation on which the plan of the Pittsburgh Group was structured.

And two of the four members of the Pittsburgh Group—Allyn and Neuenschwander—were officers and directors of the P & LE both at the time that the plan was conceived as well as during the time that it was carried out.

Plaintiffs find great fault in this. As former minority shareholders of the P & LE they feel that they have been wronged by the involvement of Allyn and Neuenschwander as a part of the acquisition group. For example, they point out that originally Allyn, as President and Chief Executive Officer of the P & LE, owned but 69 shares of the P & LE. These shares were sold to PLECO during the tender offer for the sum of $7,935. For a mere $255 Allyn had previously acquired what turned out to be his 13.4 per cent interest in PLECO. Since PLECO now owns 100 per cent of the P & LE, Allyn in effect now has a 13.4 per cent interest in the P & LE. Thus, as plaintiffs compute it, he went from a minimal shareholder position in the P & LE to a 13.4 per cent equity position in the P & LE, and helped eliminate the minority shareholders in the process, all because he was able to use the assets of the company he was running to finance the cost of the acquisition. They make a similar case with regard to Neuenschwander who originally owned 32 shares of the P & LE.

As noted at the outset, this is a class action. Plaintiffs represent two separate classes. The plaintiff Field represents the class of minority shareholders who were eliminated by the merger. Plaintiff Fanucchi represents the class of minority shareholders who tendered their shares in response to the tender offer of PLECO. On behalf of his class Fanucchi contends that the tender offer solicitation materials of PLECO omitted certain material matters. Underlying the position of both Field and Fanucchi, however, is the contention that the entire acquisition was illegal—from the purchase of the Penn Central interest through the tender offer and on through the merger—and that as a consequence both the tender offer and the merger

should be declared void and the minority shareholders returned to an equity position with regard to the P & LE.

In the final analysis plaintiffs have settled on two main theories. First, they say that in reality the overall transaction amounted to a sale of substantially all of the assets of the P & LE, and that as such it is void since it was not approved by the board of directors of the P & LE nor was it submitted to the vote of its shareholders as required by 8 *Del.C.* § 271. Second, they contend that Allyn and Neuenschwander breached the fiduciary duty owed by them to the corporation and its minority shareholders, thus fatally tainting the acquisition of the Pittsburgh Group and PLECO. As presented, I find no substance to either argument.

The suggestion that the situation here really involved a sale of assets, and thus was governed by the section of the Delaware General Corporation Law applicable to such transactions, requires little comment. Presumably, plaintiffs are arguing that since it was the intent of the Pittsburgh Group from the outset to utilize the credit of a substantial portion of the assets of the P & LE so as to complete the final step in the leveraged purchase of all of the P & LE's stock, a "purchase" of those assets by the Pittsburgh Group must be viewed as the true objective of the transaction. In other words, plaintiffs are asking that the Court look through the situation and conclude that in reality Allyn and Neuenschwander were scheming to "sell" the rolling stock of the P & LE—concededly a substantial portion of its assets—to an acquisition group of which they were a part on terms which would permit that group to use the rolling stock to finance the cost of its acquisition of all of the outstanding stock of the corporation. This is said to be evidenced by the fact that as a condition to obtaining the bridge loan through FNBB the Pittsburgh Group and PLECO contractually committed themselves to the sale and leaseback of the rolling stock to FNBB immediately upon acquiring full stock ownership of the P & LE.

In other words, in plaintiffs' view, PLE-CO and the Pittsburgh Group were bargaining on the strength of owning the rolling stock before they had ever acquired any stock interest whatever in the P & LE. Thus, plaintiffs would conclude that what was really involved here was a sale of assets, artfully disguised as something else through the use of the tender offer and merger technique. Having made this assumption, they would then have the transaction declared to be void and set aside because it was not approved by the P & LE board and because it was not submitted to the vote of all P & LE shareholders as required by 8 *Del.C.* § 271 in the case of a sale of all or a substantial portion of a corporation's assets.

To do this, however, would be to take an artificial view of the situation. The obvious facts are that a group of investors set out to acquire, if possible, the complete ownership of the P & LE. This was accomplished ultimately through three distinct steps. First, through competitive bidding, they purchased the 92.6 per cent stock interest of the existing majority shareholder. Second, they attempted to obtain all remaining shares through a properly registered tender offer. Third, as the owners of more than 97 per cent of the outstanding stock following the tender offer, they acquired the balance of the shares through the use of a short form merger under 8 *Del.C.* § 253.

Plaintiffs do not contend that the use of any of these three mechanisms was improper as such. They are simply saying that when you put them all together, the effect could be viewed to be something else, i.e., a sale and purchase of assets, and that viewed as a sale of assets, it was not accomplished in accordance with the law.

■ To begin with, I have a great deal of difficulty with the plaintiffs' concept that the situation equates with a sale of assets. Even assuming that it might, however, our law is well established under *Federal United Corporation v. Havender,* Del.Supr., 34 Del.Ch. 318, 11 A.2d 331 (1940); *Orzeck v.*

*Englehart,* Del.Supr., 41 Del.Ch. 361, 195 A.2d 375 (1963), and other decisions that different sections of the General Corporation Law have independent significance and that it is not a valid basis for challenging an act taken under one section to contend that another method of achieving the same economic end is precluded by another section. As stated in *Orzeck v. Englehart, supra,* at 195 A.2d 378:

> "[T]he general theory of the Delaware Corporation Law is that action taken under one section of that law is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same final result might be obtained by different means."

The short answer here is that there was no effort made on behalf of the P & LE to sell its rolling stock to PLECO and the Pittsburgh Group pursuant to 8 *Del.C.* § 271, and the plaintiffs can establish no legal wrong simply by branding it as such.

■ The fiduciary duty argument of the plaintiffs is, I think, similarly strained. This suit was initiated by an application for a temporary restraining order to prevent the short-form merger from taking place. At that time it was contended that the case was a simple one involving the taking of a corporate opportunity by Allyn and Neuenschwander in violation of *Guth v. Loft, Inc.,* Del.Supr., 23 Del.Ch. 255, 5 A.2d 503 (1939). The restraining order application was denied on the basis that a likelihood of success on the merits of that legal theory had not been demonstrated. This was attributable primarily to the underlying premise of such a corporate opportunity theory, namely, that Allyn and Neuenschwander were obligated in some way to cause the P & LE itself to purchase the 92.6 per cent stock interest of its majority shareholder, Penn Central, so as to convert the 7.4 per cent minority shareholders into the 100 per cent owners of the company. Subsequently, the complaint was amended and the corporate opportunity theory was abandoned.

Despite this plaintiffs still rely on certain principles taken from the *Guth v. Loft* decision as well as those set forth in *Brophy v. Cities Service Co.,* Del.Ch., 31 Del.Ch. 241, 70 A.2d 5 (1949), a leading case which prohibits corporate fiduciaries from trading in the stock of their corporation based upon inside information. As best that I can discern plaintiffs are attempting to patch together the *Guth v. Loft* and *Brophy* decisions, together with certain general statements taken from the recent decision of *Lynch v. Vickers Energy Corp.,* Del.Ch., 383 A.2d 278 (1978), to come up with the proposition that the fiduciary duty of loyalty owed by a corporate officer and director to his shareholders, when coupled with the prohibition against using his corporate position for personal profit, absolutely prohibits such an officer and director from participating with others in any plan to acquire the corporation, regardless of the fairness of the plan to the minority shareholders of the corporation, if it is the ultimate intention of the acquisition plan to use the assets and revenue generating capability of the corporation to finance the cost of the acquisition. I cannot conclude that those cases stand for such a broad-based principle.

While the general statements of fiduciary duty taken by the plaintiffs from those decisions are unassailable, I have trouble in making them fit the factual context of the present matter. Conceding, of course, that Allyn and Neuenschwander owed a fiduciary duty to the P & LE and its shareholders—both the minority shareholders as well as Penn Central—in what manner did they utilize their fiduciary positions for their own personal gain? What advantage was gained by PLECO and the Pittsburgh Group by virtue of their corporate offices?

On the facts of the matter there is no evidence that Allyn or Neuenschwander did anything to give the Pittsburgh Group or PLECO any advantage over any other party wishing to bid for the Penn Central's interest in the P & LE. On the record they were scrupulous throughout to avoid any appearance of impropriety. This was confirmed by the testimony of a representative

of the Penn Central Trustees. They did nothing to slant things in favor of their group. They were candid with all interested purchasers as to the business and financial status of the P & LE. They knew that their position was a delicate one. They advised both Penn Central and the board of directors of the P & LE of their participation in the Pittsburgh Group from the outset.

In addition, Allyn and Neuenschwander did not participate personally in the negotiations leading up to the financing of the acquisition by PLECO. This was done exclusively by Garland and Smyth. The most that can be said is that the ownership interests of Allyn and Neuenschwander in PLECO perhaps lent strength to the ability of PLECO to obtain the precarious financing required for such a highly leveraged purchase of the P & LE. It provided perhaps an added assurance to prospective lenders that Allyn and Neuenschwander would be staying on to run the railroad and thus continue its successful operation so as to generate the funds to pay off the acquisition financing. But this same assurance could have been provided by any other acquisition group through the use of long-term employment contacts for Allyn and Neuenschwander even in the absence of a shareholder interest.

This, of course, leads to the main contention of the defendants. The ability to utilize the rolling stock or other assets of the P & LE to finance the acquisition of all of its outstanding stock did not accrue to PLECO because of the fact that Allyn and Neuenschwander held fiduciary positions with the P & LE. It was a potential means of financing available to any person, corporation or investment group that was interested in acquiring the P & LE, and it was made possible to all such interested parties because of the unusual fact that a 92.6 per cent shareholder was desirous of selling its entire holdings.

■ One in a fiduciary position to a corporation and its shareholders is not absolutely prohibited from dealing in all transactions in which his corporation may have an interest. It is only a misuse of the fiduciary position that is prohibited. For instance, it is implicit in *Brophy v. Cities Service Co., supra,* that so long as a fiduciary is not profiting by inside information he is free to trade in the market place in his company's stock. He is also free to take a business opportunity for himself once his corporation has properly rejected the opportunity or if it is established that it is not in a position to take it, *Guth v. Loft, supra;* and this is true even if he learns of the opportunity through his fiduciary position. Compare, *Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218 (1976). He is even free to deal directly with outside shareholders so long as he does not take advantage of superior knowledge derived from his insider status. *Lank v. Steiner,* Del.Supr., 43 Del.Ch. 262, 224 A.2d 242 (1966).

■ As a consequence I agree with the defendants that it cannot be a breach of a fiduciary duty for a director or corporate officer to benefit personally from a wholly non-corporate transaction, unless he has derived some specialized or unique advantage from his fiduciary position. If he is merely doing that which any non-fiduciary could do, even if it can be said in a sense to constitute a "use" of the corporate assets, and if he is doing so without using his fiduciary position to gain a particular advantage over others, I find it difficult to conclude that he is breaching his fiduciary duty to his corporation and its shareholders. I find such to be the case here on the facts of the matter.

■ I think that this conclusion also disposes of the plaintiffs' argument that in order for Allyn and Neuenschwander to be permitted to participate in such an acquisition plan the minority shareholders of the P & LE, or such of them who might be interested, must be afforded an opportunity to participate in it also. For one thing I see no particular logic to such an argument. It is an argument that any time that an acquisition group desires to include a corporate

officer or director within its number, it must also take in so many of the minority shareholders as may desire to come along.

More importantly, such an argument is again based on the fiduciary duty premise. But if the corporate officer or director has no fiduciary duty not to participate in such a leveraged acquisition plan in the absence of particular facts that would show an improper use of his corporate office on his part, then I can see no fiduciary duty owed to minority shareholders to somehow permit them to retain their equity position in the corporation.

I note again that plaintiffs have offered no authority from any jurisdiction which either deals with directly or supports directly the proposition on which they are relying with regard to the alleged breach of fiduciary duties on the part of Allyn and Neuenschwander. As a consequence I find on the facts of the matter that no such breach has been established.

■ As to the separate claims of the plaintiff Fanucchi on behalf of his class that the tender offer disclosures were inadequate, I find it to be unfounded. As I view it, the offering circular contained a full disclosure of all germane facts concerning the acquisition of the P & LE and thus it met the standard of candor set forth in *Lynch v. Vickers Energy Corporation, supra.* Specifically, the roles of Allyn and Neuenschwander in PLECO were fully disclosed. The purchase of the Penn Central interest in the P & LE and the bridge loan by which it was accomplished was set forth. The offering circular also explained the future transactions which PLECO intended to undertake, including the merger, the sale and leaseback of the P & LE rolling stock, and the proposed dividend to PLECO of sufficient funds to repay the bridge loan. In short, an outline of the entire acquisition plan of PLECO and the Pittsburgh Group was fully disclosed to the minority shareholders.

Without going into the various matters which the plaintiff Fanucchi feels were improperly omitted, I find no substantial likelihood that their disclosure would have been viewed by a reasonable investor as significantly altering the total mix of the information made available. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Lynch v. Vickers Energy Corporation, supra.* They are simply representative of the usual handful of nondisclosure allegations that are typically thrown into a shareholder action such as this just in case one of them might accidently hit the mark. Here, they do not.

On the evidence I find that the minority shareholders of the P & LE who tendered their shares to PLECO in response to the tender offer did so after full disclosure by PLECO and consequently there is no basis to this aspect of the claim made on their behalf by the plaintiff Fanucchi.

Plaintiffs also throw in a host of lesser contentions, all of which I find to be without merit. By way of example, plaintiffs' counsel opened the trial by pointing out "what this case is not about." One of the things that it was said not to be about was the price paid to the minority for its shares. In counsel's words, "Price is not an issue here." By the time of post-trial briefing, however, it would seem that "price" has crept back into the plaintiffs' argument.

■ Without going into the plaintiffs' various mathematical computations dealing with book value, tender offer premiums and the like, I take note that the highest trading price for the P & LE stock immediately before the events described herein was $85 per share. In the competitive bidding for the Penn Central's 92.6 per cent interest, PLECO bid $90.25 per share which, under its formula bid, was $1.25 per share higher than the bid of anyone else. The likelihood that some control premium was also involved in the price being bid would seem evident. PLECO thereafter received an opinion from Lehman Brothers that $90.25 was also a fair price to offer the minority. PLECO nevertheless decided to offer the minority $115 per share, or $24.75 more per share than it had just paid to get the con-

trolling interest of Penn Central in a public auction. The tender offer at this price was readily accepted by some two-thirds of the minority shareholders. No shareholder sought appraisal rights as a result of the merger. When it is also considered that the P & LE is a railroad company which, realistically, cannot be liquidated, I find that I tend to agree with counsel's opening observation that price is not an issue here. Certainly, no inadequacy or unfairness of price has been established.

It is also contended that there was no proper business purpose which would justify the elimination of the remaining shareholders of the P & LE for cash under the short-form merger, and that as a consequence the elimination of the class of shareholders represented by the plaintiff Field violated the prohibition contained in *Singer v. The Magnavox Co.,* Del.Supr., 380 A.2d 969 (1977).

Under the facts of this case PLECO was formed as a Delaware corporation. It was formed for the purpose of acquiring and holding all outstanding shares of the P & LE. As a condition to obtaining the bridge loan with which to purchase the Penn Central interest—the first step in the acquisition plan—PLECO was required to commit itself to a future sale and leaseback of the rolling stock in the P & LE so as to generate the funds (through the $60 million dividend) to pay off the bridge loan. Realistically speaking, it could hardly have gotten itself in a position to do this so long as it retained minority shareholders. Thus, its ability to honor its financial commitment to FNBB could not be assured unless it owned 100 per cent of the P & LE. To provide this assurance it had to eliminate the remaining minority shareholders. If this was not a proper business purpose for eliminating the minority when viewed from PLECO's standpoint, I can scarcely imagine what one would ever be. Compare, *Tanzer v. International General Industries, Inc.,* Del.Supr., 379 A.2d 1121 (1977).

In summary, I conclude that plaintiffs have shown no basis for relief. They have made no showing on the evidence that the minority shareholders of the P & LE were treated unfairly or that the defendants Allyn and Neuenschwander acted improperly with regard to the minority shareholders or that they gained any particular advantage as a result of an improper use of their fiduciary positions with the P & LE. All they have shown is a resulting situation which they do not like since Allyn and Neuenschwander have ended up with a combined 21.8 per cent ownership interest in the company that now owns the railroad. They have based their case on this result, but they have failed to establish that the result was improperly achieved along the way. Accordingly, judgment will be entered in favor of the defendants.