John A. MORAN and the Dyson-Kissner-Moran Corporation, Plaintiffs,

and

Gretl Golter, Individually and in a derivative capacity, Plaintiff Intervenor,

v.

HOUSEHOLD INTERNATIONAL, INC. a Delaware Corporation, Donald C. Clark, Thomas D. Flynn, Mary Johnston Evans, William D. Hendry, Joseph W. James, Mitchell P. Kartalia, Gordon P. Osler, Arthur E. Rasmussen, George W. Rauch, James M. Tait, Miller Upton, Bernard F. Brennan and Gary G. Dillon, Defendants.

HOUSEHOLD INTERNATIONAL, INC., Counterclaim Plaintiff,

v.

John A. MORAN, Charles H. Dyson and The Dyson-Kissner-Moran Corporation, Counterclaim Defendants.

Court of Chancery of Delaware, New Castle County.
Submitted: Dec. 10, 1984.
Decided: Jan. 29, 1985.

Rodman Ward, Jr., Stuart L. Shapiro, Stephen P. Lamb, Thomas J. Allingham, II, and Andrew J. Turezyn, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del. and Michael W. Mitchell, Jeremy A. Berman, and Joseph A. Guglielmelli, New York City, for plaintiffs and appearing counterclaim-defendants.

Joseph A. Rosenthal, and Norman M. Monhait, of Morris and Rosenthal, P.A., Wilmington, Del., Marshall Patner, of Orlikoff, Flamm and Patner, Frederic Brace, of Brace & O'Donnell, and Geoffrey P. Miller, Chicago, Ill., for plaintiff-intervenor.

Charles F. Richards, Jr., Donald A. Bussard, Jesse A. Finkelstein, and Gregory P. Williams, of Richards, Layton & Finger, Wilmington, Del. and George A. Katz, William C. Sterling, Jr., Michael W. Schwartz, Eric M. Roth, Warren R. Stern, and Donald N. Cohen, of Wachtell, Lipton, Rosen & Katz, New York City, for defendants and for counterclaim-plaintiff.

WALSH, Vice Chancellor.

This action brought individually and derivatively by certain shareholders of Household International, Inc. ("Household") seeks to invalidate a preferred stock rights dividend plan (the "Rights Plan") adopted by a majority of Household's Board of Directors on August 14, 1984. The original plaintiffs are John A. Moran, a Household director who voted against the Rights Plan and the company of which he is Chairman, Dyson-Kissner-Moran Corporation ("D–K–M") the largest single shareholder of Household. On the eve of trial, Gretl Golter, the holder of 500 shares of Household was permitted to intervene as an additional plaintiff. In addition to Household, all its directors other than Moran and John C. Whitehead, who also voted against adoption of the Rights Plan, and Raymond C. Tower have been named defendants. Although the defendants filed a motion to dismiss the Complaint on a varie-

ty of grounds, it was agreed that it was in the interest of all concerned to expedite discovery and trial while preserving defendants' right to pursue their motion post-trial. After nine days of trial and post-trial briefing this is the decision thereon.

Plaintiffs contend that the Rights Plan, which has resulted in the issuance of what they call a "poison pill preferred," abridges fundamental rights of stock ownership by restricting the alienability and marketability of Household shares and severely limits the ability of shareholders to engage in proxy contests. Household maintains that the Rights Plan provides a drastic but highly effective deterrent device designed to prevent hostile, bust-up takeovers, for the protection of both the corporation and its shareholders. This case represents the first judicial testing of the latest defensive mechanism in the arsenal of corporate takeover weaponry.

## I

Household is a diversified holding company with its principal subsidiaries engaged in financial services, transportation and merchandising. HFC, National Car Rental System, Inc. and Vons Grocery Co. are three of its wholly-owned entities. Its present earnings exceed $200 million annually and, at current market prices, its securities approach $2 billion in value. Its present composition is the result of a series of acquisitions in recent years. In fact, the presence of Moran on the Household board is attributable to the acquisition by Household of Wallace-Murray Corporation, then controlled by D–K–M, and the resultant receipt by D–K–M of a substantial number of Household shares. Of the sixteen Household directors, nine are outside directors and one, Arthur E. Rasmussen, is a retired Chief Executive Officer and Chairman of Household. All directors are subject to annual election.

Although the adoption of the Rights Plan by the Household Board on August 14,

1984, is the focus of the present inquiry, the events which led to that step are also important. As early as February, 1984, Household's management became concerned about the company's vulnerability as a takeover target and began considering various charter amendments which would render a takeover more difficult. It requested Georgeson & Co., a leading proxy solicitation consultant, to evaluate the prospect of shareholder approval of a fair price amendment[1] at the upcoming annual meeting. On March 2, Georgeson, after analyzing Household's shareholder profile opined that such an amendment would pass, but barely, with the estimated approval rate varying from 50.8% to 58.3%. Because it was believed that there was not sufficient time available before the annual meeting, scheduled for May 8, to present management's position on the fair price amendment and in view of the predicted closeness of the vote, management decided not to pursue such an amendment.

In the meantime, Household had become the subject of scrutiny as a takeover candidate by one of its own directors, the plaintiff Moran acting on behalf of D–K–M. As the result of financial studies performed by D–K–M personnel, Moran concluded that Household's stock was significantly undervalued in relation to the company's break-up value. Thus, if Household could be acquired in a leveraged buy-out, its component assets could be partially liquidated at prices sufficient to defray the cost of acquisition and yield a substantial net profit. Moran determined to pursue this prospect directly with Household's management. To that end, he held discussions with Household's Chairman, Donald C. Clark, who in turn, requested Household's Chief Financial Officer, Rod Dammeyer to participate. During this same period D–K–M increased its Household ownership position by purchasing an additional 500,000 shares of Household common on the open market. A further disquieting development oc-

---

**1.** A fair price provision in a corporate charter generally requires supermajority approval for

certain business combinations and may set minimum price criteria for mergers.

curred on May 14, when Clark received a letter from a representative of the Murchison group, a Dallas-based investment company, requesting a meeting to discuss a matter of "mutual interest." Clark declined the meeting but reported the overture to the Household Board, including Moran.

Although Clark and Moran engaged in follow-up discussions for several weeks, Moran's suggestion of a leveraged buy-out with management's participation never got beyond the discussion stage. It does not appear that Clark gave Moran any specific encouragement although he clearly appeared to be an interested listener. Clark claims that, disregarding Moran's request, he kept certain of Household's directors advised of Moran's approach. Household claims that Moran used insider information acquired as a director to plan and propose a takeover by D–K–M, contrary to the interests of the shareholders. Whether or not Moran used information acquired as a director, and not otherwise available to him or D–K–M, is unclear from the evidence. Moran denies the use of insider information and there is no indication that Moran ever intended a hostile takeover of Household. To the contrary, his approach assumed the cooperation and participation of Household's management. In any event, at the time of the adoption of the Rights Plan, the Moran approach was not in active discussion and had not received the overt support of Clark or anyone else in Household management.

While fending off Moran's advances Clark took the lead in securing advice concerning takeover defenses. He secured the services of Wachtell, Lipton, Rosen and Katz ("Wachtell, Lipton") to advise Household on legal matters and turned to the Company's investment banker, Goldman, Sachs & Co. for financial advice. It was agreed that both Wachtell, Lipton and Goldman, Sachs would jointly formulate a takeover policy for recommendation to the Household Board at its August 14, meeting. Goldman, Sachs had previously pre-

pared a "Raid Preparedness" study for Household on May 29, 1984, which provided an overall view of the takeover climate and a listing of various takeover defenses employed by major companies in recent years. On July 31, Clark met in New York with Martin Lipton, Esquire of the Wachtell, Lipton firm for a detailed discussion of a rights plan devised by Lipton. A three page summary of this plan was mailed by Household to all directors on August 7, as part of the pre-meeting distribution of material to be discussed at the August 14 meeting. Also included were copies of articles from various business publications detailing takeover tactics and dangers including an article from Fortune magazine entitled: "Oops! My Company Is On The Block." Clark also discussed the plan as well as Moran's buy-out approach with the Chicago-area directors, constituting a majority of the Board, at a brief meeting preceding a directors' dinner on August 13.

Lipton accompanied by Gordon McMahon and Peter Fahey of Goldman, Sachs made a presentation at the August 14 meeting, which was attended by all directors. Approximately two hours was devoted to a discussion of proposed by-law amendments including the rights plan. Lipton explained that the takeover strategy involved four proposals: (1) a statement by the Board affirming that it is in the long term interests of the corporation to remain independent, (2) certain by-law amendments regulating the call of special shareholder meetings, the nature of business to be conducted in such meetings and the use of written consents, (3) changes in employee benefit plans (ESOPs) permitting the beneficial owners of stock, rather than the trustee, to tender such stock in the event of a tender offer and (4) a Preferred Share Purchase Rights Plan. The first three proposals were approved by all directors, including Moran. The proposed Rights Plan engendered discussion and disagreement.

The Rights Plan proposed by Lipton, and adopted without change by a majority of Household's Board, is novel and complicat-

ed. Indeed, its very complexity is designed to create uncertainty on the part of a potential acquiror. There is sharp disagreement between the parties concerning the implications and effect of the Rights Plan but its basic structure is clear. Under the Plan each shareholder receives one right for each share of common outstanding. The right, which has a term of ten years, entitles the holder to buy one hundredth of a share of a new series of participating preferred stock. The new preferred would be nonredeemable and subordinate to other series of the Company's preferred stock. Its dividend right is tied to the dividend for common at the rate of 100 times the dividend declared on common stock. Its liquidation preference is similarly linked to payment received by common shareholders. The exercise price for the preferred, $100 for 1/100 of a share, or $10,000 per share, is conceded to be "out of the money" in view of the current $1.75 dividend yield on Household common which has traded in recent months in a range of $30 to $33. The real impact of the rights is to be found in their "triggering" and "flip-over" features which have led to their being labeled as "poison pills."

The rights detach and may be exercised only if certain triggering events, referred to as the 20% and 30% events, occur. Prior to the occurrence of any of these events the rights are not transferable apart from the common stock to which they are affixed. Thus if a person (a) acquires 20% of Household's common shares or (b) achieves the right to purchase 20% or (c) achieves the right to vote 20% or (d) announces the formation of a group of persons holding 20% to act together, the rights are triggered. The 30% triggering event occurs upon the announcement of a tender offer or exchange offer for 30% of Household's outstanding stock.

Once a triggering event has occurred the rights may be exchanged for the new preferred upon the payment of the exercise price. Moreover, if a merger or consolidation occurs under the terms of which Household's common shares are exchanged for securities of the acquiror, the right "flips-over" and enables the holder, at the then exercise price of the right, to purchase common stock of the acquiror at a price reflecting a market value of twice the exercise price of the right. Thus the right holder would be entitled to purchase $200 worth of the acquiror's common for $100. The resultant dilution of the acquiror's capital is immediate and devastating.

The rights are redeemable by Household, at a price of $.50 per right, at any time before the occurrence of one of the 20% triggering events and even after the occurrence of the 30% event. Once triggered by a 20% triggering event, the rights are not redeemable and presumably become a permanent part of the Company's capital structure.

The minutes of the August 14 Board meeting reflect a pointed exchange between Lipton and Moran over adoption of the Rights Plan. Moran believed that the plan would have the effect of entrenching management while denying shareholders the opportunity to sell their shares at a premium in a tender offer. While agreeing that the Rights Plan had the effect of deterring certain hostile offers, particularly the two-tier type, Lipton argued that such offers serve only the short range interests of certain shareholders while the Rights Plan would encourage a potential acquiror of Household to negotiate with the Board which could protect the interests of all constituencies of the corporate family. He viewed management's ability to redeem the rights before any 20% triggering event as a strong negotiating device in a takeover situation but noted that the Rights Plan, if adopted, would not render Household takeover proof in the face of a determined acquiror who was willing to accept a modest dilution in the second step of a takeover or who would condition his offer on surrender of a certain percentage of the rights.

The only director other than Moran to vote against the Rights Plan was John C. Whitehead. Whitehead, a director of Gold-

man, Sachs had not discussed the plan with his associates of that firm who made the presentation. His concern was that the Rights Plan was a new and untested device, the adoption of which would likely draw unwanted attention to Household. At trial, Whitehead testified that he had no objection to the substance of the Plan but believed that Household should not be a "guinea pig." Clark strongly recommended adoption of the Rights Plan pointing out that the recent attempted bust-up of Avco, a Household competitor, in the course of which Household had been offered "pieces" of Avco, had created a feeling of concern among Household's employees. He advised the Board that in addition to serving the interests of its shareholders the adoption of the Rights Plan would have a positive effect on employee morale.

With Moran and Whitehead dissenting, the Household Board approved the Rights Plan. The Rights were subsequently distributed and have received listing on the New York Stock Exchange.

Plaintiffs' primary contention is that the Household Rights Plan acts to restrict both the alienability and proxy component of its shares and thereby deprives shareholders of significant property rights without their approval. At trial, plaintiffs sought to demonstrate the value and significance of that taking by evidence to the effect that two-tiered takeovers,[2] which the Plan is designed to deter, often result in significant economic benefits to shareholders. Richard C. Abbott, formerly head of mergers and acquisitions at Morgan, Stanley and Co. testified that the Household Rights Plan renders the company virtually takeover proof but in the process eliminates the competitive climate which maximizes share

ownership value to stockholders. In his view, the opportunity to sell their shares into a tender offer at a premium over market value will be lost to shareholders of Household and as a result an important incident of ownership will be surrendered without shareholder consent. While it is still possible for a determined acquiror to acquire Household in a two-tier merger it would be necessary to condition the front end of the offer on the acquisition of an extremely high percentage of shares (90% to 95%) in order to safeguard against dilution in the second stage. Such an offer, he noted, would be perceived as "weak" and enjoy little prospect for success.

Another view of how the Rights Plan is perceived by market professionals was supplied by Alan C. Greenberg, Chief Executive Officer of Bear Stearns & Company, and an experienced arbitrageur and advisor on mergers and acquisitions. Greenberg was categorical in his evaluation of the Rights Plan. He claimed that a hostile offer for Household would never be made because of the poison pill effect of the Rights Plan. Arbitrageurs, in particular, who assume a risk based on their view of the deal rather than the market, would not participate in a hostile tender offer involving a high minimum tender in the first step or one conditioned upon surrender of the rights because such an offer will fail.

Plaintiffs attack of the Rights Plan also found academic support. Professor Michael C. Jensen, Visiting Professor at the Harvard Graduate School of Business viewed the Rights Plan as diminishing share value in two respects. First, the obvious loss of premiums which accompany takeovers and, secondly through a weaken-

2. A two-tiered takeover results from the formulation by an acquiror of a two-phase bid for a target's stock. In the first phase, the bidder seeks to acquire enough shares to establish a control position and, in order to assure success of that phase, offers to purchase shares at a premium over market. The terms of the second phase may be explicit, i.e., disclosed at the time of the announcement of the first phase, or implicit and often as the result of agreement with the target's management. Announcement of the terms of an implicit second tier offer generally occurs after execution of the first phase. In either type, the second tier price is generally lower than the first tier and usually involves the exchange of debt securities of the acquiror. A two-tier offer is typically "front-end" loaded since the premium offered in the first phase is greater than the consideration extended in the second phase following a merger.

ing on the external control process which shareholders exert upon management. To the extent that shareholder rights in the area of alienability or voting is inhibited there is a loss of competition to manage corporate resources and a consequent loss in management efficiency. Professor Jensen viewed the shareholders' expectation of participation in a tender offer to be a "right" in the sense that it is not subject to the power of a Board of Directors to modify. He conceded that the basis for this right was more economic than legal. He also disputed the impression that hostile two-tier offers are destructive of the interests of most shareholders. Using data contained in the Goldman, Sachs study of May 29, and material collected by the staff of the Securities and Exchange Commission he concluded that the market price of a target company gains an average 30% in the month surrounding a tender offer. Even in two-tier offers the blended premium, *i.e.*, the combined premium on a weighted average received in both phases, generally reflects a significant increase over the pre-bid market price. While he conceded that some shareholders, particularly the small unsophisticated type, might be harmed by hostile two-tier tender offers their overall effect is beneficial to shareholders and any device adopted by management to deter such offers is not necessarily in the interests of the shareholders.

Another academic supporting Jensen's views was Professor Michael Bradley of the Graduate School of Business of the University of Michigan. Professor Bradley has conducted several studies and authored articles on successful and unsuccessful tender offers. He too concluded that the announcement of a tender offer uniformly results in an increase in market value of a target's stock. He examined 112 unsuccessful tender offers and determined that the increased market value was maintained only if there was a later change in management, *i.e.*, if control was obtained by a third party. He further opined that a tender offer must be "front-end loaded," in order to be successful. The Household

Rights Plan, because of its dilution feature, loads the back end of a two-tier offer. In his study of tender offers he had never encountered a single instance in which a back-end loaded tender offer succeeded.

Household's defense of the adoption of the Rights Plan is bottomed on the application of the business judgment rule. Its evidence was intended to establish that the Rights Plan was a reasoned and deliberate approach to deter harm to the corporation and its shareholders from abuses which are common in the present climate of corporate takeovers. The testimony of the directors who approved the Plan supported the contention that the Plan was adopted after thorough discussion and, while some directors were not conversant with all the implications of the plan, all were aware that adoption of the Plan rendered a hostile two-tier takeover of Household extremely unlikely. One outside director, Mitchell P. Kartalia, Chairman and Chief Executive Officer of Square D Company, considered the Board's review of the Right Plan proposal as the most extensive discussion of a single topic in his twelve years on the Board. The directors were advised that the adoption of the Rights Plan, though it was innovative and untested, was considered by the Wachtell, Lipton firm and by Richards, Layton and Finger, as a matter of directorial judgment under the business judgment rule.

Certain directors had direct familiarity with takeover tactics and defenses. Whitehead as an investment banker was experienced in mergers and acquisitions. Although he voted against the Plan, he testified that he had been afforded sufficient time to review the Plan before its adoption and agreed with its substance. Raymond C. Tower, also an outside director but not named as a defendant in this case, is President of FMC Corporation. He has had direct involvement in two-tier tender offers both as an offeror and as a member of a target board. He was a member of the Board of Marathon Oil Company during its acquisition experience. He believed that

the studied adoption of the Rights Plan was preferable to the frenzied last-minute devices resorted to by takeover targets such as selling of assets or defensive mergers which permanently harm the target company even if they succeed in fending off a hostile acquiror. He believed the principal advantage of the Rights Plan was the flexibility it gave the Board to deal at arm's length with a potential acquiror without resorting to self-destructive devices.

Household also offered a professional evaluation of the Rights Plan. Jay Higgins head of the Mergers and Acquisitions Department at Salomon Bros. testified in support of the plan. He agreed that the Rights Plan will effectively rule out two-tier offers for Household but believed that other acquisition routes, such as "any and all" offers continue to be viable. A significant advantage of the Rights Plan, other than its deterrent effect, is that it may be implemented without either expenditure of funds from the corporate treasury or impairing the company's financial flexibility. It does not dilute earnings nor create adverse tax consequences for the corporation or its shareholders. Support for the Rights Plan was also voiced by Raymond Troubh, a former partner of Lazard Freres with extensive experience in mergers and acquisitions. As a present or former director of Becton Dickinson, Enstar Corporation, Warner Communications and Pabst Brewery he has had firsthand experience with hostile takeovers. He believed that the extensive countermeasures resorted to by those companies in contesting hostile takeovers impaired the ability of management to operate the target companies with consequent damage to the company and its shareholders. Troubh believed that the Household Rights Plan, as a preventative measure adopted in advance of an acquiror's approach, would effectively eliminate the payment of greenmail such as occurred with Warner and Pabst.

## II

Preliminarily, it is necessary to consider Household's motion to dismiss both the Moran complaint and that of the Intervenor.[3] The merit of that motion must be measured in the context of the pleadings, not the evidence received at trial. *Haber v. Bell*, Del. Ch., 465 A.2d 353 (1983). Household seeks to dismiss the plaintiffs' complaints essentially on three grounds: First, the plaintiffs' claims are derivative and the complaints fail to comply with the requirements of Chancery Rule 23.1; second, the plaintiffs' claims are not ripe for determination; and finally, plaintiffs' claims must be dismissed under Chancery Rules 12(b)(7) and 19 for failure to join indispensable parties.

Household's first contention, that plaintiffs have alleged derivative claims which must be dismissed for failure to make demand upon the board, proceeds on the assertion that plaintiff Moran's first three stated causes of action, which purport to be individual claims, are actually derivative claims. Household maintains that despite the label Moran attaches to these claims, they must be viewed as derivative because Moran has alleged no injury distinct from that suffered by other shareholders. Moran responds that the Rights Plan directly affects fundamental shareholder rights, including voting rights, and argues that individual actions are permitted to redress the denial of such rights. Moran also asserts that he has individual standing as a director of Household to enforce the rights of its stockholders.

In determining whether a complaint states an individual or a derivative cause of action, the Court is not bound by the designation employed by the plaintiff. *Elster v. American Airlines, Inc.*, Del. Ch., 100 A.2d 219, 223 (1953); *Crane Co. v. Harsco Corp.*, D.Del., 511 F.Supp. 294, 304 (1981); 12b *Fletcher's Cyclopedia Corps.*,

3. The Intervenor has essentially adopted the Moran/D–K–M challenges to the Rights Plan but, as will later be discussed, has added separate claims. For the purpose of considering Household's motion to dismiss there is no need to distinguish between the two complaints.

§ 5912, p. 431 (Perm.Ed., Rev.Vol.1984). Rather, the nature of the action is determined from the body of the complaint. To set out an individual action, the plaintiff must allege either "an injury which is separate and distinct from that suffered by other shareholders," 12b *Fletcher's Cyclopedia Corps.*, § 5921, p. 451 (Perm.Ed., Rev.Vol.1984); *Bokat v. Getty Oil Company*, Del.Supr., 262 A.2d 246, 249 (1970) [4], or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation. *Condec Corp. v. Lunkenheimer Co.*, Del. Ch., 230 A.2d 769, 777 (1967). Where a shareholder's complaint sets out a cause of action that is both individual and derivative, the shareholder may proceed with the individual action. *Elster, supra* 100 A.2d at 222.

■ Plaintiffs' complaints, fairly read, reflect causes of action which are derivative in nature, not individual. Moran's first claim alleges that a majority of Household's directors manipulated the corporate machinery to entrench themselves in office by restricting the shareholders' right to make use of the proxy machinery to gain control of Household. Of course, a board of directors may not use the corporate machinery for the purpose of obstructing the legitimate efforts of dissident stockholders to undertake a proxy contest against management. *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971). However, where, as here, no shareholder is presently engaged in a proxy battle, and the alleged manipulation of corporate machinery does not directly prohibit proxy contests, such an action must be brought derivatively on behalf of the corporation. Any harm that may occur through the triggering of the rights accrues to the corporation. Thus, although the Rights Plan's impact on proxy contests may ultimately alter the balance of power between shareholders and the board of directors, this allegation does not involve a contractual right of the shareholders.

Because the plaintiffs are not engaged in a proxy battle, they suffer no injury distinct from that suffered by other shareholders as a result of this alleged restraint on the ability to gain control of Household through a proxy contest. Furthermore, although D–K–M is Household's largest shareholder, holding approximately 5% of its stock, it does not suffer any unique injury merely by virtue of its holdings. There is no allegation that D–K–M desires to employ its block position as a means of gaining control of Household. I conclude, therefore, that this claim must be brought derivatively.

■ The plaintiffs' second cause of action alleges a manipulation of corporate machinery which acts to deprive shareholders of their right to receive and consider takeover proposals. Although the Plan may indeed have the effect of limiting a shareholder's ability to consider takeover proposals, shareholders do not possess a contractual right to receive takeover bids. The shareholders' ability to gain premiums through takeover activity is subject to the good faith business judgment of the board of directors in structuring defensive tactics. Absent an allegation that the Rights Plan directly restricts transferability, there is no deprivation of a distinct contractual right of the shareholders. Because plaintiffs do not allege any distinct injury from the alleged restriction on their ability to receive takeover bids, this claim may only be brought derivatively on behalf of Household.

■ The third cause of action alleges that the issuance of the rights is invalid

---

**4.** In *Crane Co., supra,* at 304 the District Court stated that "an injury distinct from that of other stockholders ... is not a sufficient basis for an individual action under Delaware law." Nevertheless, the Supreme Court's language in *Bokat, supra,* at 249, indicates that a claim of distinct injury does set out an individual action. Moreover, a shareholder who suffers an injury peculiar to him should be able to maintain an individual action, even though the corporation also suffers an injury from the same wrong.

under Delaware law. This claim clearly is derivative since it calls into question the authority of the Board to alter the capital structure of the corporation, not any contractual right of the shareholders or any distinct injury to the plaintiff.

 Moran also asserts that he has individual standing to maintain this suit as a director of Household to protect the rights of Household's shareholders. This is a novel argument but it lacks authority. Whatever may be the law in other states, there is no Delaware statute which authorizes an individual action by a director, *qua* director, to correct wrongs alleged to have been inflicted on shareholders. Nor can such a right be inferred from the language of § 141 of the Delaware General Corporation Law (DGCL) which defines the powers and duties of directors. Moran's attempt to act as a surrogate to enforce the rights of shareholders merely emphasizes the derivative nature of plaintiffs' claims. In sum, because the plaintiffs' claims set out causes of action which are essentially derivative, they must comply with Chancery Rule 23.1.

Building upon the derivative nature of plaintiffs' claims Household seeks to dismiss the complaints on the basis that the plaintiffs have failed to make demand on the board as required by Chancery Rule 23.1. Plaintiffs respond that demand was futile, and have alleged facts which, in their view, satisfy the excusal of demand requirement formulated in *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984). In *Aronson*, the Supreme Court ruled that to establish demand futility, a derivative plaintiff must allege facts which create a reasonable doubt that: (1) the directors are disinterested and independent and (2) the challenged transaction otherwise was the product of a valid exercise of business judgment. In *Pogostin v. Rice*, Del.Supr., 480 A.2d 619 (1984), the Supreme Court applied the *Aronson* standard in a takeover context. In *Pogostin* the Court stated that to excuse demand "[i]t is the plaintiff's burden to allege with particularity that the

improper motive in a given set of circumstances, *i.e.,* perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct." *Pogostin, supra* at 627. Such an allegation is in conformance with the "primary purpose" standard used to determine whether the business judgment rule is applicable in control situations. *Bennett v. Propp*, Del.Supr., 187 A.2d 405 (1962).

 Although we are not involved here with defensive tactics adopted by the board in response to a specific takeover threat, the "primary purpose" standard is also applicable to prospective anti-takeover devices. *See Warner Communications v. Murdoch*, D.Del., 581 F.Supp. 1482 (1984). Thus, it is not surprising that plaintiffs allege that the Household directors attempted "to manipulate the internal corporate machinery of Household for the sole and primary purpose of entrenching themselves in office." Complaint ¶ 19. Of course, this allegation, standing alone, will not suffice to excuse demand. Rather, the complaint must allege specific facts which demonstrate that the primary purpose of management was to retain control. In my view, the plaintiffs' complaints, which set forth particularized facts alleging that the Rights Plan deters *all* hostile takeover attempts through its limitation on alienability of shares and the exercise of proxy rights, sufficiently pleads a primary purpose to retain control, and thus casts a reasonable doubt as to the disinterestedness and independence of the board at this stage of the proceedings. It should be noted that this conclusion, for the purpose of deciding excusal of demand, is restricted to the pleadings and does not involve an analysis of the voluminous evidentiary record which was developed in discovery and at trial. Therefore, the plaintiffs' complaints, while setting out derivative causes of action, adequately complied with Chancery Rule 23.1 by demonstrating futility of demand. Household's motion to dismiss the complaints on this basis is denied.

Household next seeks to dismiss the plaintiffs' complaints on the basis that the plaintiffs' claims are not ripe for determination by this Court. It argues that while the plaintiffs' allegations are premised on the triggering of the rights and the subsequent "flip-over" effect, plaintiffs cannot demonstrate that the rights will ever be triggered or that the "flip-over" provision will ever come into effect. Household also notes that under the business judgment rule it must be presumed that the board of directors will act in good faith by redeeming the rights in the face of an attractive acquisition offer. In essence, Household contends that the plaintiffs' challenge to the Rights Plans is premature and presents the Court with no justiciable controversy.

▮ Although plaintiffs' claims plainly are predicated on the triggering of the rights and the dilution associated with the flip-over provision, the plaintiffs have not initiated this action to prevent harm that may accrue to a potential acquiror as a result of the possible dilution of its capital. Rather, plaintiffs are contesting the Plan's present effect on their entitlement to receive and consider takeover proposals and to engage in a proxy fight for control of Household. They also are contesting the validity of the rights under the Delaware General Corporation Law. To this extent, the plaintiffs' suit involves the alleged present depressing effect of the Rights Plan on shareholder interests, regardless of whether the rights are in fact ever triggered.

The authorities relied upon by Household involved instances in which declaratory judgment actions were instituted to resolve the future effect of contingent events. By contrast, the plaintiffs here are seeking a declaration that the Rights Plan, because of its deterrent features, presently affects shareholders' fundamental rights and is illegal under Delaware Law.

Household also maintains that because the board must be presumed, under the business judgment rule, to have a willingness to consider all takeover proposals and redeem the rights to permit an attractive takeover bid to proceed, the shareholders are precluded from challenging the Rights Plan at this time but must await board action in a specific takeover situation. The essence of this argument is that the Rights Plan, as a prospective takeover device, is protected under the business judgment rule. This argument, however, addresses the merits of the Rights Plan and goes to the very heart of the controversy. The application of the business judgment rule to the Rights Plan is a central issue which can only be considered upon an evidential showing as will appear hereafter. Household will not be permitted to argue lack of ripeness in this bootstrap fashion.

Finally, Household seeks dismissal of plaintiffs' claims under Chancery Rules 12(b)(7) and 19 for failure to join the holders of the rights as defendants in this action. It argues that the rights holders are in contractual relationship to it and are thus indispensable parties who must be joined in order for this action to be maintained.

Chancery Rule 19(a) sets forth two criteria for required joinder of a party. The first circumstance is where "in his absence complete relief cannot be accorded among those already parties." In the second situation a person must be joined where "he claims an interest relating to the subject of the action" and his absence may either "as a practical matter impair or impede his ability to protect that interest" or "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest." Under either of these circumstances, the person must be joined under 19(a), if feasible. Where a person falls within either criteria, but joinder is not feasible, Chancery Rule 19(b) sets forth four factors to be considered by the Court in determining whether "in equity and good conscience" the action should proceed without the person:

First, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

If it is determined through evaluation of these four factors that the action should not proceed, the person is thus deemed indispensable and the action will be dismissed.

First, it must be determined whether the holders of the rights are parties to be joined, if feasible, under Chancery Rule 19(a). Household argues that complete relief cannot be granted, if limited to the parties already present, because nonparty rights holders may seek to enforce the rights in the future. This argument is shortsighted. Although the rights holders technically are not bound by this decision, a right, like stock, "issued without authority and in violation of the law is void, and confers no rights on the person to whom it is issued...." 11 *Fletcher's Cyclopedia Corps.* § 5167, p. 288 (Perm.Ed., Rev.Vol. 1971). More importantly, as a practical matter, there is presently no separate class of rights holders. The rights are affixed to the common shares and in the absence of a triggering event, are not separately tradeable or exercisable. Moreover, the interests of the common shareholders are already being asserted in derivative fashion. Presumably, the interests of those shareholders who oppose the Plan are being asserted by plaintiffs while Household, through its defense of the Plan, is advancing the cause of those shareholders who believe the Plan to be to their advantage.

The same rationale may be applied to the second test under Chancery Rule 19(a). The holders of the rights plainly have an interest in their validity. Thus, it must be determined whether their absence, which is more theoretical than real, will either impede their ability to protect that interest, or subject the parties to a risk of multiple or inconsistent obligations. Chancery Rule 19(a)(2)(i) and (ii). Because a ruling adverse to Household would, in effect, nullify the rights established under the Rights Plan, there is little risk of inconsistent obligations. The rights holders' ability to protect their interests is, therefore, problematic.

▮▮▮▮▮ Even if the rights holders may be deemed a separate and identifiable class their joinder is not feasible. It is not necessary to join a person whose interests are fully protected by the parties already present in the case. *Owens-Illinois, Inc. v. Lake Shore Land Co.,* 3rd Cir., 610 F.2d 1185 (1979); *Fetzer v. Cities Service Oil Co.,* 8th Cir., 572 F.2d 1250 (1978). Decisions interpreting the Federal Rules of Civil Procedure are accorded great weight in interpreting parallel State Court rules. *Canaday v. Superior Court in and for New Castle County,* Del.Supr., 119 A.2d 347 (1955). Household points to a line of Delaware cases holding that contractual parties, such as stockholders and optionees, are indispensable parties in actions to cancel those contracts. *Instituto Bancario Italiano v. Hunter Engineering Co., Inc.,* Del.Supr., 449 A.2d 210 (1982); *Elster v. American Airlines, Inc.,* Del. Ch., 106 A.2d 202 (1954); *Hodson v. Hodson Corp.,* Del. Ch., 80 A.2d 180 (1951). In *Elster, supra,* despite the fact that the corporation arguably would fully protect the interests of the optionees in an action to cancel the stock option plan, the Court ruled that the optionees must be given an opportunity to be heard.

▮▮▮ In all these cases, the stock or stock options were held by a limited number of individuals. By contrast, the rights here were issued generally to all the common shareholders. Delaware case law has recognized a general exception to the joinder requirement where the interested persons are so numerous that to join them

"would tend to obstruct, and probably even defeat the ends of justice." *Bay Newfoundland Co. v. Wilson & Co.*, Del.Ch., 11 A.2d 278, 281 (1940); *United Electrical Radio & Mach. Workers v. Derrickson*, Del. Ch., 102 A.2d 921 (1954). Such injustice would certainly result from requiring all rights holders to be joined in this action. Indeed the required inclusion of such persons would likely deny judicial review of the Rights Plan, a result which clearly is undesirable. I conclude, therefore, that because the rights holders' interests are fully protected by Household, they need not be joined even if feasible, and there is thus no need to consider dismissal of this action under Chancery Rule 19(b). Accordingly, the defendants' motion to dismiss must be denied.

### III

This case presents a clash of fundamental interests within the corporate structure: the unrestricted right of shareholders to participate in nonmanagement sanctioned tender offers versus the right of a Board of Directors to increase its bargaining powers in tender offers by limiting the ability of a hostile acquiror to secure control by fragmentary acquisition of shares. Plaintiffs view the Rights Plan as rendering Household virtually raid-proof by depriving its shareholders of the opportunity to sell their shares at a premium in order to confer upon Household's Board unprecedented authority to determine the success of any contemplated acquisition of the company.

At the time the Rights Plan was adopted by Household's Board at the August 14, meeting it explicitly invoked the business judgment rule, upon the advice of counsel, as authority for its action. At the level of judicial review it also seeks application of the same standard. Plaintiffs argue that the business judgment rule does not apply to actions designed to effect structural changes in the relationship between stockholders and the Board, but if it does, the rule requires the application of special scrutiny, with Household bearing the burden of proving that the Plan is fair and reasonable to the shareholders.

The business judgment rule has evolved as a corollary to the principle that a board of directors stands in a fiduciary relationship to the shareholders it represents. Because the role of a fiduciary ordinarily does not admit of any conflicting interests or conduct the business judgment rule seeks to accommodate that status to the realities of the business world. In the words of Chief Judge Seitz in *Johnson v. Trueblood*, 3rd Cir., 629 F.2d 287, 292 (1980) *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981).

It is frequently said that directors are fiduciaries. Although this statement is true in some senses, it is also obvious that if directors were held to the same standard as ordinary fiduciaries the corporation could not conduct business. For example, an ordinary fiduciary may not have the slightest conflict of interest in any transaction he undertakes on behalf of the trust. Yet by the very nature of corporate life a director has a certain amount of self-interest in everything he does. The very fact that the director wants to enhance corporate profits is in part attributable to his desire to keep shareholders satisfied so that they will not oust him.

Thus, in the absence of fraud or bad faith, directors will not be held liable for mistakes of judgment in actions arguably taken for the benefit of the corporation. *Warshaw v. Calhoun*, Del.Supr., 221 A.2d 487 (1966); *Kaplan v. Centex Corp.*, Del.Ch., 284 A.2d 119 (1971). The rule, in effect, creates a presumption which places upon the one attacking the action of the Board, the burden of demonstrating bad faith. *Johnson v. Trueblood, supra*, at 292. *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971).

Further refinements of the business judgment rule find application here. Where a majority of the directors are independent or outside directors receiving no income other than usual directors'

fees the presumption of good faith is heightened. *Warshaw v. Calhoun, supra; Puma v. Marriott*, Del.Ch., 283 A.2d 693, 695 (1971). The judgment of the directors must be an "informed" one, with the inquiry directed to the material or advice the board had available to it and whether it had sufficient opportunity to acquire knowledge concerning the problem before acting. *Kaplan v. Goldsamt*, Del.Ch., 380 A.2d 556, 568 (1977); *Puma v. Marriott, supra*, at 695.

Plaintiffs urge the application of a stricter standard of accountability under the business judgment rule. Because the Rights Plan alters fundamental stockholder rights and constitutes a device for retaining corporate control, the argument runs, the usual presumption of good faith which attends board action should not apply. Rather the burden should be upon the Board to prove that the Plan is fair and reasonable to stockholders. Plaintiffs' contention has some decisional support. *Crane v. Harsco Corp., supra. See also,* (Rosenn, J., concurring in part and dissenting in part) *Johnson v. Trueblood, supra*, 629 F.2d at 300. However, the shifting of the burden of proof in control situations has been expressly rejected by majority decisions in three federal circuits in cases applying Delaware law. *Panter v. Marshall Field & Co.*, 7th Cir., 646 F.2d 271 (1981), *cert. denied* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Crouse-Hinds Co. v. InterNorth, Inc.*, 2d Cir., 634 F.2d 690 (1980); *Johnson v. Trueblood, supra.* In *Trueblood*, Chief Judge Seitz, tracing Delaware decisional law, concluded that the presumption governs control situations "unless the plaintiff can tender evidence from which a factfinder might conclude that the defendant's sole or primary motive was to retain control * * * *." 629 F.2d at 293. The dispute over burden of proof seems to turn on differing interpretations of the decision in *Cheff v. Mathes*, Del. Supr., 199 A.2d 548 (1964). Although the Court in *Cheff* espoused a "primary purpose" test it also ruled that: (a) directors having no personal and pecuniary interest in the transaction would not be held to the same standard of proof as directors so tainted and (b) an honest mistake of judgment will not serve to impose liability if the judgment of the directors "appeared reasonable at the time." 199 A.2d at 555.

Most, if not all, of the decisions which have addressed the burden of proof under the business judgment rule in a takeover context involved review of board approval of defensive devices in response to a specific takeover threat. *See, e.g. Cheff v. Mathes, supra.,* (repurchase of a raider's shares); *Bennett v. Propp, supra,* (market purchases to prevent takeover); *Crouse-Hinds v. InterNorth, supra,* (exchange offer with friendly acquiror); *Johnson v. Trueblood, supra,* (issuance of control block to director); *Panter v. Marshall Field, supra* (acquisitions to create antitrust problem for bidder). The time constraints and rush of events which occur when a company is "in play" dictate a quick response by the board of a target company. Often the choice is between undesirable alternatives and the fact that one alternative insures control may require the directors to demonstrate the overall fairness of the transaction. *Crouse-Hinds v. InterNorth, supra.*

Where, as here, the corporate response is directed toward a perceived general vulnerability it may be viewed as pre-planned or prospective rather than reactive. Prospective contingency plans reduce the risk of ill-planned reactive devices which harm shareholder interests and lose the protection of the business judgment rule. *Warner Communications v. Murdoch, supra.* While the directors may receive the benefit of deliberation and study, an essential element for invocation of the business judgment rule, they also run the risk that the pre-planned strategy may be more expansive than necessary and inflict harm upon the corporation and its shareholders. If the cure promises to be significantly worse than the ailment even the presumption afforded by the business judgment rule may not suffice.

The business judgment rule is primarily a tool of judicial review and only indirectly a standard of conduct for corporate management. The strength of the presumption may vary according to the procedural context in which it is raised as a defense. Thus, it is applied to the conduct of directors as alleged in the pleadings for the purpose of demand excusal, *Aronson v. Lewis, supra*, or to measure ultimate success at the preliminary injunction stage, *Crane v. Harsco Corp., supra*, or at a trial on the merits, *Kaplan v. Goldsamt, supra; Cheff v. Mathes, supra; Johnson v. Trueblood, supra*. As these decisions indicate then the presumption imparted by the business judgment rule may serve a different purpose when applied at a trial on the merits of the disputed action than that which occurs on a more limited record.

Despite the nuances which have developed in the decisions applying the business judgment rule in takeover situations, I conclude that the presumption continues to afford protection to directors in pre-planned strategies as well as reactive devices adopted on an *ad hoc* basis and a showing of a "motive to retain control" is not the equivalent of bad faith sufficient to remove the presumption. *Johnson v. Trueblood, supra*, at 293. Where, however, the takeover defensive device is itself calculated to alter the structure of the corporation, apart from the question of motive, and results in a fundamental transfer of a power from one constituency (shareholders) to another (the directors) the business judgment rule will not foreclose inquiry into the directors' action.

Because the Rights Plan permits the Household Board to act as the prime negotiator of partial tender offers through the power of redemption, the resulting allocation of authority affects the structural relationship between the Board and the shareholders. It is this fundamental result, rather than a mere conflict of interest, which requires the Board to present evidence, the business judgment rule notwithstanding, that its approval of the Plan was not motivated primarily by a desire to retain control but by a reasonable belief that the Plan was necessary to protect the corporation from a perceived threat to corporate policy and effectiveness. *Cheff v. Mathes, supra*, at 555. Household is not required, however, to demonstrate the intrinsic fairness of the Plan. The *Cheff* standard requires the defendant directors to show that their adoption of the Plan was "reasonable at the time" (199 A.2d at 555). The burden thus placed may be viewed as the burden of going forward on a showing of reasonableness rather than a burden of persuasion. Because of the protection afforded directors by the business judgment rule the latter burden does not shift and remains with the plaintiffs.

## IV

Plaintiffs maintain that the business judgment rule has no application to the action of the Household Board because the preferred stock issuable under the Rights Plan is a sham security having no separate economic substance. They urge that the Board's action in issuing such securities is thus invalid, without regard to its good faith, under the decision in *Telvest, Inc. v. Olson*, Del.Ch., C.A. No. 5798, Brown, V.C., (March 8, 1979). Household replies that the rights were properly issued under the authority of DGCL § 157 and the holding in *Telvest* is of limited application. In *Telvest*, the Court invalidated a "piggyback" preferred stock dividend which had no significant dividend, liquidation and conversion rights. Its only meaningful preference lay in its supermajority voting rights which became effective only if a person holding 20% or more of the target company's shares attempted a merger or other combination.

The impact of *Telvest* can best be measured in the light of a later holding by its author, Chancellor Brown, in a case also involving the issuance of piggyback preferred stock. In *National Educational Corp. v. Bell & Howell Co.*, Del.Ch., C.A.

No. 7278, Brown, C., (August 25, 1983), the Court refused to grant a preliminary injunction to prevent the issuance of preferred stock, the principal feature of which was a 80% supermajority voting power in proposed mergers. It was concluded that, unlike the preferred in *Telvest*, the Bell and Howell preferred stock had rights additional to those related to voting power. The Court also noted that an amendment to § 151, apparently adopted in response to the ruling in *Telvest*, now permitted the issuance of the piggyback preferred by board resolution and, also unlike *Telvest*, the board's action was not a response to an ongoing hostile tender offer.

Household's contention that the preferred created under the Rights Plan has economic substance is somewhat belied by the fact that, on present projections at least, even Household views them as "out of the money." Indeed, a principal selling point in Goldman Sachs presentation to the Household Board was that the Plan involved no significant expenditure of corporate funds and imposed no new obligations upon Household's treasury. But the ten year life of the Plan required the Board to make a long range prediction of the conversion price. In view of Moran's estimate that Household had a present "break-up" value of $52 per share, the Board's selection of $100 is not without economic justification.

Despite their present contingent status, the preferred are hardly sham securities. The rights are separately tradeable, and the preferred issuable, only in the event of a triggering event and at such time their combined economic significance will be obvious—they serve to protect shareholders from the coercion of a partial tender offer. Even when issued, however, the preferred will not affect existing voting rights or impose a supermajority approval on prospective mergers. Their dividend and liquidation preferences are independently established in relation to Household's common stock. They also survive a merger at a stated exchange rate and thus they may be viewed as having as an anti-destructive effect, contractually secured in the Rights Plan. *Wood v. Coastal States Gas Corp.* Del.Supr., 401 A.2d 932, 937 (1979). It cannot be said that the rights are so lacking in economic substance as to be void as a matter of law.

Nor is the Rights Plan invalid because it inhibits alienation in partial tender offers, and thus attains the same end as a fair price amendment which would have required shareholder approval. Under the doctrine of "independent legal significance" if an action can be accomplished under one section of the General Delaware Corporation Law it need not satisfy the requirements of another section which permits the same result. *Orzeck v. Englehart*, Del.Supr., 195 A.2d 375, 377 (1963); *Hariton v. Arco Elec. Inc.*, Del.Supr., 188 A.2d 123, 125 (1963); *Field v. Allyn*, Del. Ch., 457 A.2d 1089, 1098 (1983) *aff'd.* 467 A.2d 1274 (1983).

## V

Plaintiffs contend that the Rights Plan presently affects the alienability of shares by preventing shareholders from participating in partial and two-tier tender offers. Household does not agree that the Plan has that effect but it does concede, and the evidence so indicates, that the Plan will virtually eliminate hostile two-tier offers for Household. Unsolicited or nonmanagement-endorsed tender offers which are not front-end loaded or conditioned by high minimum acquisition or the surrender of rights to avoid the dilution effect of the flip-over provision have little hope of succeeding. The market professionals on both sides agree that a high minimum offer for a company of Household's size has never been attempted and it is questionable that such an approach would succeed. Higgins believed that a high minimum might succeed if the acquiror were tenacious and well financed. It clearly would not attract the interest of arbitrageurs or large institutional investors without whose support a hostile tender offer cannot succeed. Even

a high-minimum partial offer which leaves a 5% unacquired residual may be deterred. There is apparent agreement that the primary goal of a potential acquiror is to achieve 100% ownership both for tax purposes and in order to operate the company without concern for the interests of minority shareholders.

On the evidence, I conclude that Household's Board had an informed basis for believing that Household was vulnerable to a two-tier takeover and that the adoption of a defensive plan was required. The Goldman Sachs survey supplied to the Board contained a study of the results of 94 unsolicited cash tender offers from 1976 to 1984. It noted that only 18% of the target companies remained independent following the tender offer. The balance were either acquired by the bidder or by a third party. The Goldman Sachs study also noted factors which made Household "attractive" to potential raiders, including the trading price of its stock, its hidden values and the varied portfolio of its business which would be of interest to a "bust up artist," *i.e.*, an acquiror who would sell off company assets piecemeal after acquisition. Of course, by August 14, the Household Board was also aware of Moran's overture on behalf of D–K–M and the attempted bust-up of its competitor Avco.

Certain measures adopted by the Board on August 14, as part of its general defensive strategy, *i.e.*, a resolution stressing the desirability of remaining independent, the annual meeting restrictions and the ESOP modifications, appear reasonably suited to corporate needs. At least they had the support of all board members, including Moran.

The selection of the Rights Plan as Household's principal defensive device is not so readily justified. Plaintiffs note that Whitehead, presumably the most knowledgeable of Household's directors in takeover matters, voted against the Plan because it was new and untested. At trial, however, Whitehead testified that his primary concern was that adoption of the Plan would focus attention on Household because of its novelty. He stated that since the present litigation had achieved that unwanted result he would vote for the Plan if it were presented anew. The complexity of the Plan, with its series of triggering events, was undoubtedly a challenge to the Board's understanding and some directors did not have a full appreciation of its many ramifications, particularly in the proxy area. The three page summary of the Plan does not reflect all the intricacies contained in the 48 page formal Rights Agreement entered into by Household and the Rights Agent, Harris Trust and Savings Bank. But the Board is not expected to know all particulars of the legal documents it authorizes for execution. The information supplied to the Board on August 14 provided the essentials of the Plan including a description of the triggering events, the issuance price and dividend rights of the preferred, the flip-over effect of the rights and its consequent dilution of a hostile acquiror's capital and the redeemability of the rights prior to a triggering event. The extended discussion between the Board and its legal and financial advisors before approval of the Plan reflect a full and candid evaluation of the Plan's strengths and limitations. At least two directors, Whitehead and Tower, had extensive experience in takeover tactics and Moran's forceful expression of his views served to place before the full Board a knowledgeable critique of the Plan.

Plaintiffs' academic experts, Professors Jensen and Bradley, were of the opinion that two-tiered tender offers in fact were beneficial to shareholders who ultimately sold their shares. But the coercive nature of such tender offers because of the risk that some shareholders will be "frozen out" of any premium once control is achieved is well documented. *See,* ADVISORY COMMITTEE ON TENDER OFFERS, SEC. & EXCH. COMM'N REPORT OF RECOMMENDATIONS (1983). There was thus ample cause for the concern of Household's directors.

Plaintiffs' claim that Household's adoption of the Rights Plan deprived stockholders of the "right" to participate in two-tier tender offers does not stand analysis. The principal exponent of such a "right," Professor Jensen, was unable to point to a specific legal basis for the right. Plaintiffs attempt to find the existence of such a right in the stockholder's power of alienability. The Rights Plan is not, strictly speaking, a restriction on alienability since it imposes no conditions on the sale of Household shares. Its impact is upon the prospective purchaser of shares and only such a prospective purchaser who wishes to pursue a hostile two-tier tender offer. To be sure, to the extent that such a purchaser is deterred, the ability of a particular shareholder to sell his shares is limited. But every decision of a target board to oppose a tender offer, or invite a third party to make another offer, has the same effect. Such actions by a target board, if taken to protect all corporate constituencies and not simply to retain control, have been consistently approved under the business judgment rule. *Panter v. Marshall Field, supra; Crouse-Hinds v. InterNorth, supra; Cheff v. Mathes, supra; Bennett v. Propp, supra.* Indeed the directors who have the responsibility for the governance of the corporation are entitled to formulate a takeover policy, whether it be to meet a specific threat or a general prospective one, even though that policy may not please all its shareholders.

Plaintiffs argue that if the effect of the Rights Plan is to restrict alienability of shares already issued it runs afoul of § 202(b) of the Delaware General Corporation Law (DGCL) which prohibits restrictions on the transfer or registration of securities without the consent of the holders thereof. But, as noted above, the Rights Plan does not affect the trading of Household shares or the registration of shares once traded. The negotiability of shares is not conditioned and shares remain freely transferable as provided by § 159 of the DGCL. The decision in *Joseph E. Seagram & Sons, Inc. v. Conoco, Inc.,* D.Del.

519 F.Supp. 506 (1981) does not require a different result. There the Court struck down the action of Conoco's Board of Directors in adopting a bylaw amendment which placed a restriction on the transfer of Conoco shares to aliens as violative of § 202(b) to the extent it sought to limit the transferability of shares issued prior to its adoption. The Conoco alien restriction attempted to make the transfer "void" and "ineffective as against the corporation" and would have resulted in the refusal by the corporation to recognize the transferee as a stockholder. The Household Rights Plan has no such effect on the common shares to which it attaches.

## VI·

A troublesome aspect of the Rights Plan is its potential restriction on proxy contests. The proxy inhibition arises because one of the events which trigger issuance of the preferred is the formation of a group representing 20% of Household stock for the purpose of conducting a proxy contest. The concern is somewhat speculative. The Rights Plan does not directly affect the individual voting rights of any class of Household securities. Its impact is on block voting. At trial, Household presented the testimony of a professional proxy consultant and advisor, John Wilcox of Georgeson & Co., that the Rights Plan would not prevent an otherwise capable shareholder, or group of shareholders, from engaging in a successful proxy fight. Wilcox maintained that his study of proxy contests which had occurred since January 1, 1981 revealed no correlation between the size of an insurgent's holdings and the likelihood of success. Indeed, the majority of successful contests were waged by dissidents with less than 20% of the corporation's outstanding stock. He viewed the merit of the insurgent's cause rather than the size of his holdings as the key to success. He conceded, however, that the size of an insurgent's holdings does make a difference since it reduces the number of converts needed.

Plaintiffs maintain that the Rights Plan imposes a critical inhibition on proxy contests by attaching an economic penalty, the triggering of the rights through acquisition by a person or group of voting control over twenty percent of Household's stock. Plaintiffs also argue that, at the very least, the Rights Plan renders a proxy contest more expensive by limiting the size of an insurgent group wishing to share the expense of a proxy contest. This latter contention seems somewhat strained since a group purporting to speak for shareholders representing 19% of Household's common shares, just under the triggering threshold, would reflect over $350 million of share ownership.

■■■■ The subversion of corporate democracy by manipulation of corporate machinery will not be countenanced under Delaware Law. *Schnell v. Chris-Craft Industries, supra.* Special scrutiny will be given a situation in which directors, bent upon entrenchment, use their authority to restrict the ability of shareholders to replace them. *Giuricich v. Emtrol Corp.,* Del.Supr., 449 A.2d 232 (1982); *Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906 (1980). There are, however, options available to a board of directors, under the business judgment rule, which may restrict the scope of shareholder approval. Thus, a self-tender offer may indirectly narrow the voting pool and decrease the number of shares required for majority approval. Similarly, the enactment of supermajority approval for acquisitions through board resolution may alter the percentage of approval for a proposed merger. *National Education Corp. v. Bell & Howell Co., supra.* The right of a shareholder to vote his shares is not immutable if the goal is not entrenchment and the voting change is otherwise within the board's authority.

The proxy contest effect of the Household Rights Plan cannot be viewed in isolation. It is part of the overall design of the Plan to limit the impact of partial tender offers deemed destructive of shareholder interests. Without this feature the Plan is of limited value. The triggering effect of 20% ownership may be easily circumvented by 20% proxy control for the purposes of voiding the Rights Plan incident to a two-tiered plan of acquisition. The significance of the 20% figure whether for ownership or voting purposes is its recognized threshold for measuring control of a publicly held corporation. See, *Dan River, Inc. v. Unitex Ltd.,* 4th Cir., 624 F.2d 1216, 1225 (1980), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981). Similarly, the 20% restriction if limited to individual ownership would fall short of the intended goal. Thus, the Plan extends the 20% triggering event to the formation of an ownership group, acting in concert for the purposes of a proxy contest. The group concept and beneficial ownership have been admittedly borrowed from comparable provisions in federal regulations under Sections 13(d) and 14(d) of the Securities Exchange Act of 1934.

Thus, while the Rights Plan does deter the formation of proxy efforts of a certain magnitude, it does not limit the voting power of individual shares. On the evidence presented it is highly conjectural to assume that a particular effort to assert shareholder views in the election of directors or revisions of corporate policy will be frustrated by the proxy feature of the Plan. Household's witnesses, Troubh and Higgins described recent corporate takeover battles in which insurgents holding less than 10% stock ownership were able to secure corporate control through a proxy contest or the threat of one.

■■■ The Household Board was advised of the ramifications of the Plan on proxy contests and believed the inclusion of such a feature is essential, for the deterrent effect of the Plan to achieve full strength. When viewed as part of the overall policy adopted by the Household Board to deter hostile takeovers, the proxy limitation has a rational purpose and is defensible apart from its incidental consequence of limiting the proxy activity of those opposed to the Board's present policies.

## VII

The Intervenor's complaint also derivatively filed, essentially tracks the claims of Moran and D–K–M directed to the Rights Plans. In addition the Intervenor challenges the August 14, resolution, which Moran voted to approve, amending certain of Household's Employee Stock Ownership Plans (ESPOs)[5]. The effect of the Board's action was to amend Household's ESOPs to provide that in the event of a takeover or exchange offer (1) the right to tender or exchange shares would pass through from the ESOP trustee to the individual participants and (2) no shares may be tendered or exchanged without specific instructions from the ESOP participants. The Intervenor argues that the latter change is unlawful because it attempts to remove the trustees' fiduciary responsibility to vote the ESOP shares in the absence of specific instructions from the employee beneficiaries. Nonaction, the Intervenor argues, does not demonstrate a decision not to tender, but more likely indicates the participants' desire that trustees fully evaluate the tender offer and respond to it.

Household contends that the Intervenor's allegations are predicated on a violation of ERISA, 29 U.S.C. § 1001 *et seq.*, over which the federal courts have exclusive jurisdiction. It argues that the Intervenor's complaint alleges a breach of fiduciary duty based on the fact that the amendment to the ESOPs violates the provisions of ERISA. Because a decision in favor of the Intervenor on this claim, it argues, would require a finding that the plan, as amended, violates ERISA, this Court has no jurisdiction over this matter. Household relies on *Investment Associates, Inc. v. Standard Power & Light Corp.*, Del.Ch., 48 A.2d 501, *aff'd*, Del.

Supr., 51 A.2d 572 (1947), wherein this Court refused to recognize a claim seeking to enforce a duty created by the Securities Exchange Act, over which the federal courts have exclusive jurisdiction.

 Although the Intervenor does argue that the Plan violates the provisions of ERISA,[6] she does not seek to enforce a duty created under that statute. Rather, the Intervenor notes that this duty exists independently of the federal statute, which simply codifies the duty of loyalty found in the general law of trusts. To the extent that Intervenor's claim arises from a duty created at common law, rather than by ERISA, this Court has jurisdiction over this claim. *Investments Associates, Inc., supra*, at 510. Of course, the provisions of ERISA are not controlling in defining the scope of this independent, common law duty. *Williams v. Sterling Oil of Oklahoma, Inc.*, Del.Ch., 267 A.2d 630, 634 (1970).

 The essence of the Intervenor's argument is that because a trustee is more apt to vote independently of management, the amendment of the ESOPs to remove the trustees' residual voting power is a manipulation of corporate machinery designed to entrench management. The Intervenor plainly lacks standing to challenge the effect of the plan on the fiduciary duty owed by the trustees to the participants. Thus, her claim may only extend to the effect of the plan amendment on the shareholders' ability to gain premiums through takeover activity. She argues that a tender offer for Household is less likely to succeed because of the removal of the trustees' residual voting power. Even if I were to accept Intervenor's unproven assump-

---

**5.** The Intervenor also attacks the expenditure of corporate funds in connection with Household's counterclaim against Moran and its filing of a separate federal action against Moran for alleged securities violations. No evidence was presented on this claim and it was given only passing reference in Intervenor's brief. Whether or not it was tacitly abandoned it is clearly without merit.

**6.** The Intervenor during trial attempted to introduce into evidence the testimony of Professor John Langbein on the effects of the plan with respect to ERISA. After the Intervenor acknowledged that this testimony simply represented the witness' legal opinion it was excluded upon Household's objection.

tion that trustees are more likely to tender shares in response to a tender offer than are the participants, her argument nevertheless fails for the same reasons Moran's alienation argument was rejected. A corporate action, the primary purpose of which is not to retain control, will not be invalidated merely because it indirectly impacts upon the shareholders' ability to gain premiums through takeovers. Here, the directors claim that the resolution was adopted to further employee morale. Even if the amendment had the further effect of limiting the number of shares which could be attracted to a takeover proposal, the Intervenor has failed to demonstrate that the primary purpose of the resolution was to retain control. See *Johnson v. Trueblood, supra.*

## VIII

Finally to be considered is Household's counterclaim against Moran, D–K–M and the latter's Chairman Emeritus, Charles H. Dyson. Dyson, however, was not served in this action and Household's claim against him was not seriously pursued at trial. The theory of the counterclaim, as pleaded, is that Moran used his position as a director to gain access to confidential information concerning Household's assets for the purpose of formulating a leveraged buy-out of Household for the benefit of himself and the other counterclaim defendants and at the expense of Household's other shareholders. Household contends that as a director, Moran had a fiduciary duty to refrain from using information, gained by virtue of his position, for personal profit. On the evidence presented at trial, it appears that the counterclaim is, at best, an offensive weapon used for defensive purposes.

■ Moran's status as a fiduciary is not in dispute. Nor is the fact that D–K–M, at Moran's urging, acquired an additional 500,000 shares of Household stock during the spring of 1984 at a time when its market price had fallen below book value. Since D–K–M was already Household's

largest single shareholder that purchase, in itself, was hardly unusual. Moreover, the purchase was disclosed to Household management and was clearly not precluded by Moran's status as a director. *Field v. Allyn, supra.*

■ While the evidence presented at trial supports Household's claim that Moran, and his subordinates at D–K–M, conducted detailed analyses of Household in an effort to determine its breakup value there was nothing secret about that activity. Clark and Dammeyer were parties to discussions in which this data was considered. Even if it be assumed that Moran in making that evaluation had the benefit of information gained as a director, there is no evidence that Moran disclosed that information to a third party or sought to use that information in a manner hostile to Household's interests. To the contrary, the consistent theme which runs through Moran and D–K–M's acquisition interest in Household was a desire to involve management in a leveraged buy-out, a goal Moran was legally free to pursue if he wished. *Field v. Allyn, supra.* The evidence supports Whitehead's assessment of Moran that he would not be a party to a hostile move against Household.

Since Household's counterclaim is totally lacking in evidential support, judgment in favor of Moran and D–K–M must be entered.

## IX

Based on the foregoing analysis of the ramifications of the Rights Plan, I am satisfied that it has been properly adopted under Delaware law, is not intended primarily for entrenchment of management and serves a rational corporate purpose. It is also concluded that while the Plan indirectly limits alienation of shares and the conduct of proxy contests those features are sustainable, within the parameters of the business judgment rule, as necessary to protect the corporation and all its constituencies from the coercive nature of certain partial tender offers. To the extent the Plan produces changes within the corporate

structure, Household has demonstrated the relationship between these changes and the perceived danger from unbridled takeover activity. Household's claim that the Rights Plan provides it with much-needed flexibility in dealing with potential acquirors is clearly supported by the evidence.

Tower praised the Rights Plan because it was not an irreversible alternative to a takeover such as the "scorched earth" tactics resorted to by certain takeover targets which had the effect of permanently harming the corporation. And while the Household Board at the same time it approved the Rights Plan adopted a resolution which indicated that it was in the best interests of the corporation to remain independent, Clark and other directors maintain that the Board would entertain acquisition approaches in good faith if they were deemed beneficial to Household.

It must be emphasized, however, that the Rights Plan also creates the potential for the misuse of directorial authority. Indeed, much of the evidence presented by plaintiffs was intended to conjure up examples of possible arbitrary power by the Household Board in using the Rights Plan to deter acquisition approaches which might well be in the interests of all shareholders. As Professor Jensen noted, the economic benefits of takeover activity are divided between the target and the bidder based upon the relative bargaining power of the parties. A board armed with a Rights Plan of the type now under review will possess a bargaining tool which can be used to extract concessions from an acquiror which it otherwise would not secure, or to deter the acquisition effort entirely. Through its power to redeem the rights before a triggering event occurs the Household Board has assumed a plenary negotiating role. It has also taken upon itself the responsibility for assuring that the rights are not triggered in such a fashion as to inflict harm upon the corporation by rendering it acquisition-proof. Moreover, the threat by a determined and well-financed raider to trigger the rights, might, in itself, subject Household to the risk of "greenmail." These risks cannot be measured in the absence of specific acquisition approaches. Nor can it be assumed that the Board will act contrary to the interests of the shareholders. Those events and plaintiffs' fears must await another day.

I conclude that, on the evidence presented, the adoption of the Rights Plan is an appropriate exercise of managerial judgment under the business judgment rule. Accordingly, judgment must be entered in favor of the Defendants. On the counterclaim, judgment is entered in favor of Moran and D–K–M.

An appropriate order should be submitted.